UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD IHRIG,

    Petitioner,

v.

DIANA K. BUTLER, Warden,

    Respondent.
_____/

No. C 03-3371 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. The matter is submitted.

## BACKGROUND

Petitioner was convicted by a jury of second degree robbery. With enhancements for four prior "three strike" convictions, he was sentenced to prison for thirty years to life. On November 8, 2002, the California Court of Appeal affirmed the conviction and sentence and denied petitioner's habeas petition. A petition for review was denied by the California Supreme Court on February 11, 2003. On July 18, 2003, petitioner filed this habeas corpus petition.

The following facts are taken from the opinion of the California Court of Appeal:

**A. Prosecution Case**

On September 1, 1999, Nasim Foroughi was working as a teller at Downey Savings Bank in Los Gatos. At about 1:20 p.m., a man, who was wearing a hat, sunglasses and a nylon stocking over his face, entered the bank and walked to Foroughi's window. The man moved his hand under his shirt and demanded money. Foroughi was terrified. After her supervisor, Linda Krafty, indicated that she should give the man money, Foroughi gave him $1,000. When the robber demanded more money, Krafty told him, "Let me call the vault teller to bring you some more money." While Krafty was on the telephone, the robber left the bank.

When the police interviewed Foroughi, she said the robber was "skinny" and about 6' tall. Several weeks later, Detective Leyton Howard showed Foroughi a photo lineup that included defendant's photograph. Foroughi identified defendant, claiming that she was "70 percent" certain that he was the robber.

At trial, Foroughi testified that the robber was a thin man who was between 5' 7" and 6' tall. Initially, she testified that the robber was about the same height as the prosecutor, who was 5'8" tall. On redirect examination, she testified that she told an FBI agent that the robber was 6' tall. The prosecutor and Howard then approached the witness stand, and the prosecutor asked Foroughi to compare their heights to the robber's. Foroughi testified that the robber was taller than the prosecutor and the same height as Howard, who was 6'2". Foroughi testified that defendant was similar to the robber in height and general appearance. She was "70 percent" certain of her courtroom identification.

Foroughi also identified various prosecution exhibits. She testified that Exhibit 2 was a photograph of the robber that was taken by a bank surveillance camera. She also testified that a pair of black sunglasses and three nylon stockings that had been retrieved from defendant's room were "similar" to those worn by the robber. However, she conceded that the sunglasses had a curve or "V" shape while those in the bank surveillance photograph appeared to be straight.

Linda Krafty, a bank manager at Downey Savings Bank, testified that she "had a good view" of the robber for four to five minutes. Krafty described the robber as thin and between 5'10" and 6' tall.FN3 After the prosecutor and Howard approached the witness stand, Krafty testified that the robber was taller than the prosecutor and about the same height as Howard. When the police showed her a photo lineup, she did not choose defendant's photograph. However, when Krafty saw defendant at the preliminary hearing, she identified him as the robber. Krafty noted "the shape of [defendant's] face, the cheek bones, ... the ears ... the highness of the forehead." Krafty also identified defendant as the robber at trial.

FN3. Krafty told a police officer after the robbery that the robber was about 5'8" tall.

Pat Goddard, who was opening an account at Downey Savings Bank when the robbery occurred, testified that she heard a voice say, "Well go back and get it." She saw a man, who was not older than 30, moving his hand

under his sweater. The man was thin and taller than the prosecutor, and "a little bit shorter" than Howard. After viewing the photo lineup, she said defendant and another individual most resembled the robber.

David Spindler testified that he owned a house at 108 Jamie Court in Los Gatos, which was two blocks from Downey Savings Bank. Spindler had known defendant's mother for many years and shared his house with her. In October 1998, defendant moved into their house. In October 1999, defendant was not working and owed Spindler for two months' rent. According to Spindler, defendant did not own a car and used a bicycle or the bus for transportation. When an FBI agent showed Spindler the bank surveillance photograph of the robber, he said that it looked like defendant. Spindler was "definitely not" happy about making this identification. Spindler also testified that defendant's brother Tony had previously lived in defendant's room. Tony had a large fish tank, which he removed in May or June 1999. Defendant's mother had a small fish bowl.

Janice Gray testified that she had been defendant's parole officer since August 1998. She met with defendant once a month between August 1998 and February 1999 and twice per quarter until October 1999. In October 1999, Howard told her that he was bringing her information about a bank robbery in which defendant was a suspect. When Howard showed her the bank surveillance photograph, Gray thought of defendant and said to herself, "Richard, what are you doing in this picture?" Gray based her identification on defendant's nose, chin, mustache, short hair, and jaw and cheek lines.

Howard testified as to how he prepared the photo lineup shown to Foroughi, Krafty, and Goddard. The photograph of defendant had been taken in 1994. Howard also testified as to the search of defendant's room on October 22, 1999. He found a pair of black sunglasses and three nylon stockings, two of which were cut at both ends. Howard also observed a ten to fifteen gallon fish tank in the bedroom. According to Howard, the distance between defendant's residence and the bank was 300 feet.

Nancy Marte, a criminalist, testified that she analyzed the stockings found in defendant's room. The stockings were cut open on both sides, and there was no evidence of human contact or that the stockings had been used to clean a fish bowl.

### B. Defense Case

Chris Ihrig, defendant's brother, testified that on September 1, 1999, he went grocery shopping after he left work. When he arrived home at about 3:30 p.m., defendant and Armando Moreno were at his house. Chris's grocery receipt was printed at 3:21 p.m. on September 1, 1999. Chris, Moreno, and defendant then had a barbecue.

Moreno, who lived in Chris's converted garage, testified that defendant was at their house on September 1, 1999. Defendant arrived between 10:30 to 11:00 a.m. Defendant drank some beer and whiskey, and Chris returned home. After Moreno and defendant helped Chris unload the groceries, they had a barbecue. Chris also acknowledged that his telephone number appeared on defendant's hotel telephone bill on the night after the robbery.

      JoAnn Kerins, defendant's mother, testified that her son Tony owned a 50-gallon fish tank, but he had removed it from defendant's bedroom prior to the search by Howard. Kerins also testified that she had a small fish bowl in her room, and that she and defendant used nylon stockings to strain the water when the bowl became dirty. Kerins conceded that the bank surveillance photograph "look[ed] like it could be [her] son."

      Kathy Pezdek, a professor of psychology, testified as an expert witness in eyewitness identification, memory, and image perception and recall. She testified as to the limitations of memory and the inherent problems of eyewitness identification.

      Jose Romero and Ray Mendoza testified that they had worked with defendant for months, and they did not recognize him in the photo lineup prepared by Howard. Mendoza also did not believe that defendant was depicted in the bank surveillance photograph.

      The parties stipulated that defendant worked for Wolf Engineering from May 3, 1999 to July 28, 1999. Mike Boyd testified that defendant worked for his tree trimming service for two pay periods that ended on August 27, 1999.

### C. Prosecution Rebuttal

      Gigi Alviiar, the manager of the Hedding Inn in San Jose, identified hotel records showing that defendant rented a room for $90 on the night of September 2, 1999, and that a five-minute telephone call had been placed from that room to Chris's home telephone.

      Howard testified that the small fish bowl identified by defendant's mother was not in defendant's room at the time of the search. He also testified that the nylon stockings would not have fit over the fish tank that he saw in defendant's room. According to Howard, when he interviewed Moreno in May 2000, Moreno was unable to provide the date of the barbecue.

Ex. 5 (opinion of court of appeal) at 2-6; *People v. Ihrig*, No. H021885, 2002 Cal. App. LEXIS 10341 at *3-8 (Cal. App. 6th Dist. 2002).

### STANDARD OF REVIEW

A district court may not grant a petition for writ of habeas corpus challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529

U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, it falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The federal court on habeas review may not issue the writ simply because that court independently concludes that the state court incorrectly applied clearly established federal law. *Id*. at 411. Rather, the reviewing federal court must find the application to be "objectively unreasonable" in order to support granting the writ. *Id*. at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000) (reversed on other grounds).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n.2 (9th Cir. 2000). In this case the last reasoned opinion is that of the California Court of Appeal.

## DISCUSSION

As grounds for federal habeas relief, petitioner asserts that his constitutional due process rights were violated due to ineffective assistance of counsel at trial and by the introduction of inadmissible evidence at trial. Petitioner also alleges that the trial court violated state sentencing procedures in staying a one-year enhancement for a prior prison term.

## I. Ineffective Assistance of Counsel

Petitioner claims his counsel at trial was ineffective for (1) failing to object to the admission of sunglasses found in his home; (2) failing to prevent the introduction of "height experiments" in court; (3) failing to object to opinion testimony that he resembled the robber; (4) failing to prevent the introduction of evidence of petitioner's financial condition. and (5) failing to present various evidence at trial that would have supported the defense theory of the case.

A habeas petitioner challenging a conviction on grounds of ineffective assistance of counsel must demonstrate two things.  First, he must show that his lawyer's representation was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Second, he must show that, but for his counsel's deficient performance, it is reasonably probable that there would have been a different result at trial.  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  A reviewing court may examine the alleged prejudice suffered by the defendant without first determining whether counsel's performance was deficient.  *Id.* at 697.

Here, petitioner did not suffer prejudice by his counsel's failure to object to the introduction of the sunglasses recovered in petitioner's bedroom during the police investigation of the robbery ("Exhibit 3").  Petitioner claims that Exhibit 3 was irrelevant in that it only proved he had sunglasses "similar" to those used in the robbery.  (Pet. 8.) During trial, two eyewitnesses to the crime testified that the robber was wearing dark sunglasses, but neither was able to positively identify Exhibit 3 as the actual sunglasses worn by the robber.  Therefore, although the California Court of Appeal held, and this court agrees, that Exhibit 3 was "arguably inadmissible evidence," Ex. 5 at 9; *Ihrig*, 2002 Cal. App. LEXIS 10341 at *14, given the inability of any witness to tie Exhibit 3 to petitioner, there is no reasonable probability that an objection to its introduction would have resulted in a more favorable outcome for petitioner.

Defense counsel's failure to object to "height experiments" in court did not constitute

ineffective assistance. As stated, petitioner must show that the alleged deficient legal representation prejudiced his defense. During the investigation and before trial, eyewitnesses made statements that the bank robber was between 5'7" and 6' tall. Petitioner is 6'1". During trial, the prosecutor asked eyewitness Foroughi to compare the height of the robber to witness Howard (just under 6'2") and to the prosecutor himself (5'8"), to which the witness testified that the robber was taller than the prosecutor and approximately the same height as Howard. Ex. 2 (trial transcript) at 87. Later, eyewitnesses Krafty and Goddard were asked to make the same comparison, and their testimony was essentially identical to Foroughi's. *See* Ex. 2 at 107, 150. These experiments resulted in all three eyewitnesses describing, at trial, the robber as between 5'8" and 6'2" in height. Their prior statements, that the robber was between 5'7" and 6' tall, were not significantly different. Since the evidence relating to the robber's height would have been substantially the same with or without the prosecution's height experiments, there is no reasonable probability that an objection to them would have resulted in a more favorable outcome for petitioner.

Petitioner was similarly not prejudiced by defense counsel's failure to object to the use of opinion testimony by witnesses regarding the resemblance of petitioner to the robber shown in a bank surveillance photograph. Witnesses Spindler, Gray, and Kerins all testified that the robber in the bank photo either looked like petitioner or looked "like it could be" him. *See* Ex. 2 at 178-79, 207, 314. By contrast, witnesses Chris Ihrig and Moreno testified that the robber in the bank photo did not resemble petitioner. *See* Ex. 2 at 296, 475. Also, witnesses Romero and Mendoza testified that they did not recognize anyone in a lineup of six bank surveillance photos, including one depicting petitioner. *See* Ex. 2 at 443, 486. Each witness that was shown the bank photo knew petitioner personally and testified to having had contact with him frequently for periods of several months during 1999. Also, there was no evidence that petitioner significantly altered his appearance during that time. Rather than unfairly prejudicing petitioner, the lack of consensus among the seven witnesses who saw the bank photos more likely benefitted the defense theory

that there was reasonable doubt as to the identity of the robber.  Therefore, there is no reasonable probability that an objection to the testimony would have resulted in a more favorable outcome.

It was not ineffective assistance for defense counsel to fail to object to the introduction of evidence of petitioner's financial condition.  Petitioner claims that his trial counsel should have prevented the prosecution from presenting evidence of his unemployed status and his failure to pay his rent, to establish motive for the robbery.  (Pet. 26.)  Witness Spindler testified that he thought petitioner had not worked from August 1999 until late September 1999.  Ex. 2 at 170.  Spindler also testified that he typically collects rent in the amount of  $100 or $150 per month, from petitioner on or around the first of each month, and petitioner was late with his payments for the months of September and October 1999.  Ex. 2 at 169-70.  For the defense, witness Boyd testified that his company's payroll records showed that petitioner had received a paycheck on August 12, 1999, and another on August 27, 1999, for work performed during those periods.  Ex. 2 at 480-81.  The prosecution did not offer any explanation for why petitioner was unable to pay his September rent with the income he received in August.  The prosecution also failed to explain why, after allegedly obtaining $1000 from the bank robbery on September 1, 1999, petitioner would still be late on his rent for September and October 1999 (totaling no more than $300), as of October 22, 1999.[1]  The evidence introduced regarding petitioner's financial condition did not tend to support the prosecution's theory of motive, so it is not reasonably probable that its exclusion would have resulted in a more favorable result for petitioner.

Petitioner also claims that he suffered ineffective assistance at trial because defense counsel failed to introduce evidence to establish (1) that the sunglasses worn by the robber were in fact not the same ones introduced as Exhibit 3; (2) that eyewitnesses may have identified petitioner due to their familiarity with him in the community; and (3) that the presence of the nylon stockings in petitioner's bedroom had a benign explanation.

---

[1] During the course of investigation, Detective Howard visited Spindler's house on October 22, 1999, where petitioner was living, and inquired about petitioner's employment and rent status.

Page 8 of  13

To establish that his counsel was ineffective, petitioner must show that his lawyer's representation was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. When evaluating an attorney's performance for potential deficiency, there is a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment. *Id.* at 690.

Defense counsel's failure to produce a receipt showing that petitioner's sunglasses were purchased after the robbery did not constitute ineffective assistance. During his opening remarks, defense counsel told the jury that petitioner's mother had a receipt for the sunglasses that showed they were purchased after September 1, 1999, and that he would introduce the receipt into evidence. Ex. 2 at 42. That receipt was never submitted, and defense counsel never asked petitioner's mother, witness Kerins, to testify about it. In closing arguments, the prosecution made reference to defense counsel's failure to provide such evidence, suggesting that the defense did not introduce the receipt because it could not produce it. Ex. 2 at 545. Although it may have been error for trial counsel to suggest that he would produce the receipt and then fail to do so, any error was harmless since the eyewitnesses were unable to positively identify Exhibit 3 as the sunglasses worn during the robbery.

Petitioner claims that trial counsel rendered ineffective assistance by failing to introduce evidence that eyewitnesses may have identified petitioner due to their familiarity with him in the community. This court disagrees. Trial counsel did introduce evidence, through the testimony of witness Kerins, that petitioner frequently rode his bicycle around the neighborhood. Ex. 2 at 309-11. Petitioner does not provide any additional support for his claim that eyewitnesses may have seen him in the community. He does not allege a single instance in which any one of the three eyewitnesses actually did see him in the community either before or after the date of the robbery. Petitioner does offer evidence that he had been in the bank on at least one occasion prior to the date of the robbery (Pet. 18), but does not allege that any of the eyewitnesses were ever in the bank at the same

time.  Therefore, trial counsel's minimal effort to show that petitioner was a visible member of the community did not fall below an objective standard of reasonableness.

Finally, petitioner argues that trial counsel rendered ineffective assistance by failing to introduce evidence tending to show that the presence of cut nylon stockings in petitioner's bedroom had a benign explanation.  Petitioner's claim has no merit, since his counsel did introduce such evidence through the testimony of witness Kerins, who demonstrated in court how the stockings could be used to clean the small fish bowl in petitioner's home.  *See* Ex. 2 at 308.

## II.     Due process

Petitioner claims that evidence of his economic condition and parole status was improperly admitted and violated his due process rights.  When evaluating a habeas claim challenging the admissibility of evidence at trial, the relevant determination is not whether state evidence laws were violated, but rather "whether the trial court committed an error which rendered the trial so arbitrary and fundamentally unfair that it violated federal due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.1991) (quoting *Reiger v. Christensen*, 789 F.2d 1425, 1430 (9th Cir. 1986)).  There are two broad types of constitutional errors that may occur during the course of a criminal proceeding: trial error and structural error.  *Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir. 1994).  The errors alleged by petitioner do not fall within the short list for which the Supreme Court has found structural error analysis to apply.  *See Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005) (citing *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993) (beyond a reasonable doubt standard); *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986) (unlawful exclusion of member of defendant's race from grand jury); *Waller v. Georgia*, 467 U.S. 39, 49-50, 49 n.9 (1984) (right to public trial); *McKaskle v. Wiggins*, 465 U.S. 168, 177-78 n.8 (1984) (violation of right to self-representation at trial); *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963) (deprivation of right to counsel); and *Tumey v. Ohio*, 273 U.S. 510, 531-32 (1927) (trial by biased judge)).  Where claims of trial errors are at issue, those errors "which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the

Federal Constitution, be deemed harmless," do not require the automatic reversal of the conviction. *Chapman v. California*, 386 U.S. 18, 22 (1967).

Petitioner alleges that it was error for the trial court to admit evidence of his economic condition. State evidentiary principles preclude the admission of a defendant's poverty to establish motive to commit robbery. *People v. Wilson*, 3 Cal.4th 926, 939 (Cal. 1992). However, the sudden possession of money, after a robbery has been committed, by a previously "impecunious" defendant may be admitted. *People v. Kelly*, 132 Cal. 430, 431-432 (Cal. 1901). Here, although petitioner was unemployed at the time of the robbery and had not yet paid his rent for the month of September, he was able to pay $90 for a hotel room on the night after the robbery. *See* Ex. 2 at 496-99, 574-75. Petitioner's sudden possession of money immediately after the robbery renders evidence of his economic condition admissible.

However, even if the trial court did err in admitting evidence of petitioner's economic condition, any error was harmless and did not violate petitioner's due process rights. If the jury may draw any permissible inferences from a piece of evidence, its admission does not violate due process. *Jammal*, 926 F.2d at 920. Here, the jury could reasonably infer that petitioner paid for the hotel room with the money that was stolen from the bank, thus petitioner's due process rights were not violated by admission of evidence of his economic condition.

Petitioner alleges that the trial court violated his due process rights by admitting evidence that he was on parole. In California, "the court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice." Cal. Evid. Code § 352 (2008). The California Supreme Court has granted "broad discretion" to the courts in weighing the relative probative value of evidence against concerns of undue prejudice. *People v. Rodriques*, 8 Cal. 4th 1060, 1124 (Cal. 1994). The trial judge in this case ruled that the identification of witness Gray as petitioner's parole agent carried a probative value that outweighed its potential for prejudice. Ex. 2 at 12. Even if the trial court did err in admitting this evidence, petitioner's due process rights were not violated because the error

was harmless. Petitioner's parole status was only used to establish the frequency and nature of the meetings that he had with witness Gray. Ex. 2 at 203. Also, in criminal trials, juries are presumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). As such, the trial court admonished the jury not to consider petitioner's parole status as suggestive of his character or potential guilt. Ex. 2 at 203-04.

Petitioner correctly argues that the length of jury deliberations may be considered when assessing harmlessness. "'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'" *United States v. Lopez*, 500 F.3d 840, 846 (9th Cir. 2007) (quoting *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001)). However, contrary to petitioner's claim that his was a close case, the fact that the jury deliberated for four and a half hours before returning a guilty verdict suggests that any errors in the admission of evidence were harmless. *See e.g. Lopez*, 500 F.3d at 846 (jury's deliberation for two and a half hours on illegal reentry case suggested any error in allowing testimony or commentary on defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (jury deliberations for four days supported inference that impermissible evidence affected deliberations).

### III.     Stay of One-year Enhancement of Sentence

Petitioner claims that a one-year enhancement for a prior prison term should have been stricken, rather than stayed, by the sentencing court. A federal court sitting in habeas corpus is bound by a state court's interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). The scope of the federal court's review is limited to violations of the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Here, petitioner was sentenced to 25 years to life under the California "three strikes" law, with an additional five years for a prior serious felony conviction and a one-year enhancement stayed for a prior prison term. Petitioner alleges that the one-year enhancement should have been stricken under California law. On direct appeal, the state court of appeal affirmed the stay of the one-year enhancement. Ex. 5 at 16; *Ihrig*, 2002 Cal. App. LEXIS 10341 at *26. Since petitioner

1  does not claim that the sentence violates any federal law, his challenge to that portion of
2  the sentence is not reviewable by this court on habeas corpus.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The clerk shall close the file.

**IT IS SO ORDERED.**

DATED: June 26, 2008

PHYLLIS J. HAMILTON
United States District Judge

g:\pro-se\pjh\hc.03\ihrig371.denial.wpd

Page 13 of 13